Marian GUINN, Plaintiff–Appellee,

v.

The **CHURCH OF CHRIST OF COL-LINSVILLE**, Oklahoma, a non-profit corporation; Allen Cash, Ted Moody and Ron Witten, Defendants–Appellants.

No. 62154.

Supreme Court of Oklahoma.

Jan. 17, 1989.

Rehearing Denied May 9, 1989.

Thomas Dee Frasier, Steven R. Hickman, Messrs. Frasier, Frasier & Gullekson, Tulsa, for plaintiff-appellee.

Deryl L. Gotcher, Roy C. Breedlove, Graydon D. Luthey, Jr., Messrs. Jones, Givens, Gotcher, Doyle & Bogan, and Truman B. Rucker, Jr., King, Rucker & Finnerty, Inc., Tulsa, for defendants-appellants.

OPALA, Vice Chief Justice.

The dispositive first-impression question presented is whether a state forensic inquiry into an alleged tortious act by a religious body against its former member is an unconstitutional usurpation of the church's prerogatives by a secular court and hence prohibited by the First Amendment. We answer in the negative.

## I

## FACTS

The plaintiff-appellee, Marian Guinn [Parishioner], and her children moved to Collinsville, Oklahoma in 1974. While staying with her sister, Parishioner became acquainted with the defendants-appellants, Ron Whitten, Ted Moody and Allen Cash [collectively referred to as the "Elders"] in their capacities as Elders of the Collinsville Church of Christ. A few weeks later, Parishioner became a member of that congregation. Both Parishioner and the Elders agree that the first few years of Parishioner's membership reflected the mutual support inherent in a relationship between a religious organization and one of its members. Parishioner attended services and the congregation extended to her a financial and emotional helping hand.

In 1980 the Elders confronted Parishioner with a rumor that she was having sexual relations with a male Collinsville resident [companion], who was not a member of the Church of Christ. According to the Elders, they pursued this rumor in order to uphold their doctrinal commands which require that they, as church leaders, monitor the congregation members' actions, as well as confront and discuss prob-

lems with any one who is "having trouble." The Church of Christ follows a literal interpretation of the Bible which serves as the church's sole source of moral, religious and ethical guidance. When confronted with the allegation, Parishioner admitted violating the Church of Christ's prohibition against fornication. As a transgressor of the denomination's code of ethics, Parishioner became subject to the disciplinary procedure set forth in Matthew 18:13–17.[1]

The Elders carried out the biblically-mandated disciplinary procedure in three stages, with the entire process lasting more than a year. First, the Elders approached Parishioner and her children in a laundromat and requested that she appear before the church and repent of the fornication sin. They also suggested that Parishioner refrain from seeing her companion.

The second of the three "meetings" was held at the church. According to the Parishioner, her attendance dropped considerably after the Elders initially confronted her in the laundromat. The Elders had called Parishioner and told her that if she did not come to church to discuss her continuing relationship with her companion they would come to her house. Although the bad weather that night made the Parishioner anxious about leaving her children alone, she decided to meet with the Elders at the church. They instructed her to stop seeing her companion. Parishioner agreed this was the best solution because

her relationship with him was deteriorating.

The third and final meeting took place on the driveway outside the Parishioner's home when she was under suspicion of having been with her companion. The Elders parked near Parishioner's house and awaited her arrival. When Parishioner's car pulled into the driveway, the Elders approached it and told Parishioner and her companion that if she did not appear before the congregation and repent of her fornication sin, the members would "withdraw fellowship"[2] from her.

On September 21, 1981, a few days after the third meeting, the Elders sent Parishioner a letter warning her that if she did not repent, the withdrawal of fellowship process would be commenced. At this point Parishioner realized the Elders intended to inform the congregation of her sexual involvement with the companion. She sought legal advice in an effort to ascertain her rights. On September 24 her lawyer sent the Elders a letter and advised them not to expose Parishioner's private life to the Collinsville congregation which comprised approximately five percent of the town's population. The Elders did not heed her lawyer's advice.

On September 25, 1981 Parishioner wrote the Elders a letter imploring them not to mention her name in church except to tell the congregation that she had withdrawn from membership. The Elders ignored Parishioner's requests. On September 27

---

1. The provisions of Matthew 18:13–17 are:

   "And if so be that he find it, verily I say unto you, he rejoiceth more of that sheep, than of the ninety and nine which went not astray. Even so it is not the will of you Father which is in heaven, that one of these little ones should perish.
   Moreover, *if thy brother shall trespass against thee, go and tell him his fault between thee and him alone:* if he shall hear thee, thou hast gained thy brother.
   *But if he will not hear thee, then take with thee one or two more, that in the mouth of two or three witnesses every word may be established. And if he shall neglect to hear them, tell it unto the church: but if he neglect to hear the church, let him be unto thee as a heathen man and a publican."* [Emphasis supplied.] The Holy Bible, King James version, National Bible Press (Philadelphia).

2. Withdrawal of fellowship is a disciplinary procedure that is carried out by the entire membership in a Church of Christ congregation. When one member has violated the church's code of ethics and refuses to repent, the elders read aloud to the congregation those scriptures which were violated. The congregation then withdraws its fellowship from the wayward member by refusing to acknowledge that person's presence. According to the Elders, this process serves a dual purpose: it causes the transgressor to feel lonely and thus to desire repentence and a return to fellowship with the other members; and secondly, it ensures that the church and its remaining members continue to be pure and free from sin. Parishioner was aware of the Church of Christ's belief in its practice of fellowship withdrawal and had witnessed one such disciplinary proceeding during her five-year membership in the congregation.

they read to the congregation the September 21 letter they had sent to Parishioner. During the same service the Elders advised the congregation to contact Parishioner and to encourage her to repent and return to the Church. The Elders also told the congregation that should their attempts fail, the scriptures Parishioner had violated would be read aloud at the next service and the withdrawal of fellowship proceeding would begin.

Parishioner met with one of the Elders personally and again attempted to dissuade him from divulging her private life to the congregation. *The Elder told her that withdrawing membership from the Church of Christ was not only doctrinally impossible but it could not halt the disciplinary sanction being carried out against her. The Church of Christ believes that all its members are a family; one can be born into a family but can never truly withdraw from it. A Church of Christ member can voluntarily join the church's flock but cannot then disassociate oneself from it.*

According to one of the Elders, Parishioner was publicly branded a fornicator when the scriptures she had violated were recited to the Collinsville Church of Christ congregation on October 4. As part of the disciplinary process the same information about Parishioner's transgressions was sent to four other area Church of Christ congregations to be read aloud during services.

For the torts of outrage and invasion of privacy Parishioner recovered actual and punitive damages from the three Elders and from the Collinsville Church of Christ.[3] Parishioner alleged in her claim of outrage that when disciplining her the Elders employed methods which caused her emotional anguish. Her claim of invasion of privacy was cast in two theories. Firstly, Parishioner asserted the Elders intruded upon her seclusion by carrying out against her religious disciplinary measures which were highly offensive, unreasonable and intrusive. Secondly, Parishioner claimed the Elders unreasonably publicized private facts about her life by communicating her transgressions to the Collinsville and the four other area Church of Christ congregations. After overruling the Elders' demurrers and their motion for summary judgment, the trial court submitted the case to the jury; its verdict was in favor of Parishioner and against each of the three individual Elders. The parties stipulated the Elders were at all times acting as agents of the Church of Christ corporation and thus the trial court found the judgment against the Elders also was a judgment against the Collinsville Church of Christ. The jury awarded $205,000 in actual and $185,000 in punitive damages; the trial court then added $44,737 in prejudgment interest.

II

THE RELIGION CLAUSES OF THE FIRST AMENDMENT, WHICH PROHIBIT BOTH STATE AND FEDERAL GOVERNMENTS FROM INHIBITING OR SUPPORTING CITIZENS' RELIGIOUS INTERESTS, WERE WRITTEN IN AN EFFORT TO CREATE AN ENVIRONMENT IN WHICH "MANY TYPES OF LIFE, CHARACTER, OPINION AND BELIEF ... [COULD] DEVELOP UNMOLESTED AND UNOBSTRUCTED."[4]

Many of our forefathers who left England and its governmentally established church for America did so in pursuit of religious freedom. Before the adoption of

---

3. Although the judgment on jury verdict refers to the Parishioner's three "causes of action," we note that Parishioner's amended petition alleges but *two* "causes of action." [1] The first was premised on two separate "invasion of privacy" theories—i.e., intrusion upon the Parishioner's seclusion and publication of private facts about her, all of which were allegedly designed to damage her name and reputation and to expose her to public contempt and ridicule. [2] The second "cause of action" asserted a tort of outrage based on extreme and outrageous conduct of an intentional and reckless nature which caused her "severe emotional distress" and "shock," especially since the Elders publicized the Parishioner's conduct in the presence of her minor children.

4. *Cantwell v. State of Connecticut,* 310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213 [1940].

the Constitution of the United States those who had risked life and limb in an effort to explore the possibilities of a free world found themselves "legislat[ing] not only in respect to the establishment of religion, but in respect to its doctrines and precepts as well."[5] To ensure the religious freedom for which so many of the colonists had struggled, the first session of the first Congress adopted the First Amendment[6] to the Constitution of the United States:

"Believing with you that religion is a matter which lies solely between man and his God; that he owes account to none other for his faith or his worship ... I contemplate with sovereign reverence that act of the whole American people which declared that their Legislature should 'make no law respecting an establishment of religion or prohibiting the free exercise thereof,' thus building a wall of separation between Church and State."[7]

From its inception the First Amendment has required that the government "be a neutral [element] in its relations with groups of religious believers and non-believers."[8] In other words, state power should be used neither to handicap religions nor to favor them.[9]

Since the First Amendment's ratification in 1791, the United States Supreme Court has been exploring its scope and effect in light of the relationships and controversies which invoke its application. At its core the First Amendment shields and protects religious liberties of citizens from both state[10] and federal governmental interference:

"The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections."[11]

In its exhortation of the values protected by the First Amendment's Free Exercise Clause, the Court has stated that "[t]he essential characteristic of these [religious] liberties is, that under their shield many types of life, character, opinion and belief can develop unmolested and unobstructed."[12] *Under the Establishment Clause, neither the state nor the federal government can "force ... [or] influence a person to go or to remain away from church against his will or force him to profess a belief or disbelief in any religion."*[13] [Emphasis supplied.]

■ Depending upon whether the governmental intrusion into the sacred realm

---

5. *Reynolds v. United States,* 98 U.S. [8 Otto] 145, 162, 25 L.Ed. 244 [1879].

6. The First Amendment to the United States Constitution states:
   "Congress shall make no law respecting an *establishment of religion,* or prohibiting the *free exercise thereof;* or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." [Emphasis supplied.]

7. This was a quote by Thomas Jefferson in response to an address given by a committee of the Danbury Baptist Association (January 1, 1802), reprinted in 8 Writings of Thomas Jefferson 113 (H. Washington ed. 1861). See also, *Reynolds v. United States,* 98 U.S. [8 Otto] 145, 164, 25 L.Ed. 244 [1879].

8. *Everson v. Board of Education of Ewing TP.,* 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 [1947].

9. *Everson v. Board of Education of Ewing TP.,* supra note 8, 330 U.S. at 18, 67 S.Ct. at 513.

10. In *Cantwell v. State of Connecticut, supra* note 4, the Fourteenth Amendment was interpreted to make the First Amendment prohibitions applicable to state action that abridges religious freedom:
    "The fundamental concept of liberty embodied in ... [the Fourteenth] Amendment embraces the liberties guaranteed by the First Amendment." 310 U.S. at 303, 60 S.Ct. at 903.

11. *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 1185–86, 87 L.Ed. 1628 [1943].

12. See *Cantwell v. State of Connecticut, supra* note 4, 310 U.S. at 310, 60 S.Ct. at 906.

13. *Everson v. Board of Education of Ewing TP.,* supra note 8, 330 U.S. at 15, 67 S.Ct. at 511.

of religious liberties is by way of judicial enforcement of legislative mandate,[14] or judicial determination of the "proper" standards of ecclesiastical conduct within a particular sect,[15] the Court has developed different means of inquiry into the constitutionality of a challenged action. If the alleged interference with religious freedom is effected by a statute or by judicial enforcement of a statute, the Court balances what must be a "compelling" governmental interest against the asserted First Amendment liberty. Governmental "regulation" is justified *only* when there is a clear and present danger of riot, disorder, interference with traffic upon the public streets, or any other immediate threat to public safety, peace, or order, appears.[16] "[I]n this highly sensitive constitutional area, '[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation.'"[17]

On the other hand, if the interference with a protected religious liberty is accomplished through civil forensic adjudication of a dispute among members of an ecclesiastical organization over the proper interpretation of religious doctrine, the constitutional issue is whether the secular court should have abstained from deciding the matter:

"In ... [cases involving disputes within hierarchical churches][18] we think the

---

**14.** According to *New York Times Co. v. Sullivan,* 376 U.S. 254, 265, 84 S.Ct. 710, 718, 11 L.Ed.2d 686–87 [1964], an application of both statutory and common law constitutes state action for purposes of constitutional violations. The issue "is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised." *Sullivan, supra,* 376 U.S. at 265, 84 S.Ct. at 718.

In *Presbyterian Ch. v. Mary E.B. Hull Mem. Pres. Ch.,* 393 U.S. 440, 448–449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 [1969], the Court specifically acknowledged that State invasion of constitutional rights could occur through legislation as well as through civil court adjudication:

"This holding [in *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church of North America,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952) ] invalidating legislative action was extended to judicial action in *Kreshik v. St. Nicholas Cathedral,* 363 U.S. 190, 80 S.Ct. 1037, 4 L.Ed.2d 1140 [1960], where the Court held that the Constitutional guarantees of religious liberty required the reversal of a judgment of the New York courts which transferred control of St. Nicholas Cathedral from the central governing authority of the Russian Orthodox Church to the independent Russian Church of America."

**15.** In *Watson v. Jones,* 80 U.S. [13 Wall.] 679, 680, 20 L.Ed. 666, 667 [1872], the Court addressed the following questions:

"[I]n these matters of religious doctrine, discipline, and church order, who is to be the judge? Who has the right to say conclusively, in case of controversy, that one or the other party [to a religious dispute] has departed from the doctrines of the church? Who shall determine upon the validity of an act or judgment of a church court; upon the status of a member or an officer; upon the legality or otherwise of a voluntary or enforced severance of a part from the body of the general organization?"

The Court conceded that the philosophy espoused by Lord Eldon and followed in the English courts maintained that it is "the duty of the [civil] court ... to inquire and decide for itself, not only what ... [is] the nature and power of these church judicatories, but what is the true standard of faith in the church organization, and which of the contending parties before the court holds to this standard." *Watson, supra,* 80 U.S. [13 Wall.] at 727. The Court remarked that it did "not think the doctrines of the English chancery court on this subject should have ... the influence which ... [it] would cheerfully accord to it on others," *Watson, supra,* 80 U.S. [13 Wall.] at 729, and *went on to hold that civil courts exercise no jurisdiction over purely ecclesiastical matters.*

**16.** *Cantwell v. State of Connecticut, supra* note 4, 310 U.S. at 308, 60 S.Ct. at 905. We note that this "compelling governmental interest" exception is now more commonly referred to in terms of activity that *is a threat to "public safety, peace or order." Sherbert v. Verner,* 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 [1963].

**17.** *Sherbert v. Verner, supra* note 16, 374 U.S. at 406, 83 S.Ct. at 1795, quoting *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430 [1945].

**18.** The religious denomination involved in the case at bar is "congregational," not "hierarchical." According to Judicial Intervention in Disputes Over the Use of Church Property, 75 Harv. L.Rev. 1142, 1143–44 [1962], there are three general categories of church polity—congregational, presbyterial and episcopal:

"In the congregational form, each local congregation is self-governing. The presbyterial polities are representative, authority being exercised by laymen and ministers organized in an ascending succession of judicatories—presbytery over the session of the local church,

rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline or of faith, or ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." [19]

If members of religious organizations could freely pursue their doctrinal grievances in civil courts, or legislatures could pass laws to inhibit or enhance religious activities, ecclesiastical liberty would be subjected to governmental interference and the "unmolested and unobstructed" development of opinion and belief which the First Amendment shield was designed to foster could be secularly undermined.

While the Court in *Watson* unequivocally banned judicial scrutiny of purely ecclesiastical decisions,[20] it has since discussed the possibility of "marginal civil court review" of these disputes. In *Gonzalez v. Roman Catholic Archbishop of Manila* [21] the Court stated:

"In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise. Under like circumstances, effect is given in the courts to the determinations of the judicatory bodies established by clubs and civil associations."

In a later case, *Serbian Eastern Orthodox Diocese, Etc. v. Milivojevich,*[22] the Court announced that its *Gonzalez* "fraud, collusion, or arbitrariness" exception was dictum only, concluding that:

"whether or not there is room for 'marginal civil court review' under the narrow rubrics of 'fraud' or 'collusion' when church tribunals act in bad faith for secular purposes, no 'arbitrariness' exception—in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations—is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of a hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical

---

synod over presbytery, and general assembly over all. In the episcopal form power reposes in clerical superiors, such as bishops. Roughly, presbyterial and episcopal polities may be considered hierarchical, as opposed to congregational polities, in which the autonomy of the local congregation is the central principle."

While the United States Supreme Court has addressed civil court inquiry into ecclesiastical decisions made by hierarchical churches, it has not dealt with this issue in the context of a church which is congregational in form. Nevertheless, we are of the opinion that a church's disciplinary decisions are protected from judicial scrutiny whether the church is "congregational" or "hierarchical." Accord: *First Baptist Church of Glen Este v. State of Ohio,* 591 F.Supp. 676 [S.D.Ohio 1983] and *Nunn v. Black,* 506 F.Supp. 444 [W.D.Va.1981].

Each Church of Christ congregation is self-governing and thus answers to no other religious body. There is no hierarchical structure and

thus no religious authority beyond the particular congregation to which a disgruntled member can appeal for support. Disputes are settled locally within the congregation of which the parties are members. Disciplinary decisions made by churches within this form of government are no less fair or deserving of judicial deference than decisions made by churches structured in a hierarchical fashion. The lack of a congregation's own "religious" court of appeals is not justification for the intervention and review by a civil tribunal.

19. *Watson v. Jones, supra* note 15, 80 U.S. [13 Wall] at 727.

20. See *supra* note 15.

21. 280 U.S. 1, 16–17, 50 S.Ct. 5, 7–8, 74 L.Ed. 131 [1929].

22. 426 U.S. 696, 713, 96 S.Ct. 2372, 2382, 49 L.Ed.2d 151 [1976].

rule, custom, or law." [23]

In *Serbian* the Court held that:

"the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them." [24]

Although the Court has explicitly eliminated an "arbitrariness" exception to the rule that civil courts are prohibited from adjudicating religious disputes, whether these tribunals are still constitutionally permitted to review final ecclesiastical decisions for "fraud" or "collusion" has not recently been revisited.

The specific governmental interference with First Amendment rights challenged here is civil court enforcement of tort law against the Church of Christ Elders and not a judicial adjudication of the doctrinal propriety of the disciplinary measures carried out by the Elders against Parishioner. Parishioner did not attack the Elders' disciplinary actions on the basis that they contravened established Church of Christ polity. Rather, she claimed that the Elders' actions—whether or not in conformity to established church doctrine—amounted to a tortious invasion of her rights for which she was entitled to recover. While this dispute involved a religiously-founded disciplinary matter, it was not the sort of private ecclesiastical controversy which the Court has deemed immune from judicial scrutiny.[25] According to a federal circuit court case, *Paul v. Watchtower Bible & Tract Soc. of New York,*[26] "[e]cclesiastical

abstention ... provides that civil courts may not redetermine the correctness of an interpretation of canonical text or some decision relating to government of the religious polity." Unlike the instant controversy, the class of religious dispute which the Court has traditionally held to be outside the purview of civil judicature involves arguments among members over interpretation of church doctrine, or over actions taken pursuant to an allegedly incorrect construction of church rules.[27] Because the controversy in the instant case is concerned with the allegedly tortious nature of religiously-motivated acts and not with their orthodoxy *vis-a-vis* established church doctrine, the justification for judicial abstention is nonexistent and the theory does not apply.

The dispute between Parishioner and the Elders is clearly not immune from secular judicature and was properly before the trial court. Nevertheless, the nisi prius decision holding the Elders responsible in tort, and the subsequent verdict imposing liability, present a judicial and thus state interference with the alleged exercise of First Amendment rights which may not be sanctioned lest it pass constitutional muster. In testing the constitutionality of the court's action against the Elders and the jury's verdict in Parishioner's favor, the proper inquiry is whether, on the record, the Elders' decision to discipline Parishioner constituted such a threat to the public safety, peace or order that it justified the state trial court's decision to pursue the compelling interest of providing its citizens with a means of vindicating their rights conferred by tort law.

## III

## THE DISCIPLINARY ACTIONS TAKEN BY THE ELDERS AGAINST PA-

---

**23.** *Serbian Eastern Orthodox Diocese, Etc. v. Milivojevich, supra* note 22, 426 U.S. at 713, 96 S.Ct. at 2382.

**24.** *Serbian Eastern Orthodox Diocese v. Milivojevich, supra* note 22 at 426 U.S. at 724–725, 96 S.Ct. at 2387–2388.

**25.** *Serbian Eastern Orthodox Diocese, Etc. v. Milivojevich, supra* note 22, 426 U.S. at 713, 96 S.Ct. at 2382.

**26.** 819 F.2d 875, 878, n. 1 [9th Cir.1987], cert. denied, — U.S. —, 108 S.Ct. 289, 98 L.Ed.2d 249 [1987].

**27.** See e.g., *Watson v. Jones, supra* note 15, and *Kreshik v. St. Nicholas Cathedral, supra* note 14.

RISHIONER BEFORE SHE WITH-
DREW HER MEMBERSHIP FROM
THE CHURCH OF CHRIST DID NOT
CONSTITUTE A THREAT TO PUBLIC
SAFETY, PEACE OR ORDER AND
HENCE DID NOT JUSTIFY STATE IN-
TERFERENCE.

■ Prior to Parishioner's withdrawal of membership from the Church of Christ, the Elders approached her on three separate occasions to explain the doctrinally-mandated consequences confronting a member who had been accused of transgressing church law. According to the Elders, these three meetings comprised the initial stage of the withdrawal-of-fellowship procedure. In an effort to gain her repentance, they were required to "go and tell [the transgressing member her] fault."[28] Parishioner testified she was aware of the withdrawal-of-fellowship procedure and knew what it would entail.

*The trial court's refusal to give summary judgment to the Elders on Parishioner's prewithdrawal tort claims[29] and its adjudication of this protected conduct constituted a governmental burden on the Church of Christ's right to its free exercise of religion.* While the state has a compelling interest in providing a forum where its citizens can adjudicate their rights under tort law, the intrusion into the Elders' First Amendment freedoms which that interest requires is not constitutionally supportable. The Elders' protected conduct clearly did not justify governmental regulation on the ground that it posed a serious threat to public safety, health or welfare. Although "[t]he limits [on religious freedom] begin to operate whenever activities begin to affect or collide with liberties of others or of the public[,] [r]eligious activities which concern only members of the faith are and ought to be free—

as nearly absolutely free as anything can be."[30]

When people voluntarily join together in pursuit of spiritual fulfillment, the First Amendment requires that the government respect their decision and not impose its own ideas on the religious organization. Under the First Amendment people may freely consent to being spiritually governed by an established set of ecclesiastical tenets defined and carried out by those chosen to interpret and impose them:

"The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it."[31]

Under the First Amendment's Free Exercise Clause, Parishioner had the right to consent as a participant in the practices and beliefs of the Church of Christ without fear of governmental interference. As the Church's chosen spiritual leaders, the Elders were responsible for providing guidance to all those who, like the Parishioner, had chosen to follow. Under the Free Exercise Clause the Elders had the right to rely on Parishioner's consensual participation in the congregation when they disciplined her as one who had voluntarily elected to adhere to their doctrinal precepts. Parishioner's willing submission to the Church of Christ's dogma, and the Elders' reliance on that submission, collectively shielded the church's prewithdrawal, religiously-motivated discipline from scrutiny through secular judicature.

**28.** See *Matthew, supra* note 1.

**29.** Those claims include invasion of privacy by intrusion on seclusion and intentional infliction of emotional distress.

**30.** *Prince v. Commonwealth,* 321 U.S. 158, 177, 64 S.Ct. 438, 445, 88 L.Ed. 645 [1944] (Jackson, J., dissenting). See also, Comment, *Religious Torts: Applying the Consent Doctrine as Defini-*

*tional Balancing,* 19 U.C.D.L.Rev. 949, 974–979 [1986]; Note, *Intentional Infliction of Emotional Distress by Spiritual Counselors: Can Outrageous Conduct be "Free Exercise"?,* 84 Mich.L. Rev. 1296, 1310–1312 [1986].

**31.** *Watson v. Jones, supra* note 15, 80 U.S. [13 Wall.] at 728–729.

██ We must hence direct the trial court that on remand partial summary adjudication be rendered against Parishioner for that portion of her claim which is pressed for the Elders' prewithdrawal acts. Whether a cause is to be remanded for new trial or returned with instruction to enter judgment for the prevailing party on appeal is governed by the teaching of *Sherrill v. Sovereign Camp, W.O.W.*[32] There we said:

"[I]f the [appellate] court is of the opinion that other evidence may be produced on a new trial or is unable to say that such evidence may not be produced, it will not render final judgment but will remand the case for a new trial."

An appellate court may properly reverse with directions to enter judgment only when "the evidence is manifestly insufficient and it does not appear that any new evidence can be procured on a retrial of the cause."[33] Before an appellate court can order an action, or any part of it, terminated on a judgment's reversal for insufficiency of the evidence, it must appear that the appellee cannot recover on a new trial—it is not enough that recovery appear improbable.[34]

Applying these common-law rules to this case, we reverse and remand with instructions to dismiss those portions of Parishioner's tort claims by which she seeks recovery for the Elders' prewithdrawal conduct. While Parishioner has not had an opportunity to present specific evidence on the issue whether the Elders' prewithdrawal acts were a threat to the public safety, peace or order, we are convinced that affording her an opportunity to do so would be a meaningless gesture. Although we acknowledge that there may be some religiously motivated, consensual acts which could constitute a threat to the public safety, peace or order great enough to fall *dehors* First Amendment protection,[35] we hold that, on the record of this case, the Elders' prewithdrawal acts are shielded from scrutiny by secular judicature. The Parishioner could not possibly recover on retrial.[36] Insofar as she seeks vindication for the actions taken by the Elders before her membership's withdrawal, her claims are to be dismissed.

## IV

### THE RIGHT TO WITHDRAW ONE'S IMPLIED CONSENT TO SUBMIT TO THE DISCIPLINARY DECISIONS OF A CHURCH IS CONSTITUTIONALLY UNQUALIFIED; ITS RELINQUISHMENT REQUIRES A KNOWING AND INTELLIGENT WAIVER.

██ Parishioner asserts that her withdrawal of membership from the Collinsville Church of Christ was also effective as a withdrawal of her consent to submit to that church's beliefs and ecclesiastical disciplinary procedures. Upon her withdrawal, Parishioner urges, the church was precluded from sanctioning her as if she were a current member. By continuing to discipline her as though she were a practicing Church of Christ member, the Elders are

---

**32.** 184 Okl. 204, 86 P.2d 295, 296 [1939].

**33.** See *Sherrill v. Sovereign Camp, W.O.W., supra* note 32, 86 P.2d at 296.

**34.** *Sherrill v. Sovereign Camp, W.O.W., supra* note 32 at 296; see also, *Johnston v. Dill,* 179 Okl. 32, 64 P.2d 329 [1937].

**35.** In *Reynolds v. United States, supra* note 5, 98 U.S. [8 Otto.] at 166–167, the Court acknowledged that some religiously motivated acts are undeserving of First Amendment protection:

"Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Or if a wife religiously believed it was her duty to burn herself upon the funeral pile of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice?

So here, as a law of the organization of society under the exclusive dominion of the United States, it is provided that plural marriages shall not be allowed. Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances."

**36.** See *Kelly v. Oliver Farm Equipment Sales Co.,* 169 Okl. 269, 36 P.2d 888, 891 [1934].

alleged to have invaded her privacy and caused her emotional distress.

In defense of their actions the Elders claim that the Church of Christ has *no doctrinal provision for withdrawal of membership.* According to their beliefs, a member remains a part of the congregation for life. Like those who are born into a family, they may leave but they can never really sever the familial bond. A court's determination that Parishioner effectively withdrew her membership and thus her consent to submit to church doctrine would, according to the Elders, be a constitutionally impermissible state usurpation of religious discipline accomplished through judicial interference.

The Elders had never been confronted with a member who chose to withdraw from the church. Because disciplinary proceedings against Parishioner had already commenced when she withdrew her membership, the Elders concluded their actions could not be hindered by her withdrawal and would be protected by the First Amendment. Parishioner relies on her September 24, 1981 handwritten letter to the Elders in which she unequivocally stated that she withdrew her membership and terminated her consent to being treated as a member of the Church of Christ communion. By common-law standards we find her communication was an effective withdrawal of her membership and of her consent to religious discipline.

Just as freedom to worship is protected by the First Amendment, so also is the liberty *to recede* from one's religious allegiance.[37] In *Torcaso v. Watkins*[38] the Court reaffirmed that neither a state nor the federal government can force or influence a person *to go or to remain away from* church against one's will or *to profess a belief or disbelief* in any religion. The First Amendment clearly safeguards the *freedom to worship* as well as the *freedom not to worship.*

The Court has long recognized that the key to maintaining a strong government while fostering the growth of cherished and respected forms of religious belief is to preserve the freedom to choose one's individual genre of worship.[39] In *Engel v. Vitale,* the first "school prayer" case, the Court held that the use of a prayer, which was composed by a state board of regents and was to be recited daily by teachers in a public school system, violated the Establishment Clause of the First Amendment. The Court reasoned that such a practice allowed the government to place "its official stamp of approval upon one particular kind of prayer or one particular form of religious services."[40]

*Engel* is supported by historical fact; many who left England and its governmentally established church for America did so in pursuit of religious freedom. The First Amendment of the United States

---

**37.** See Comment, *supra* note 30 at 978 n. 143; Note, *supra* note 30 at 1311.

**38.** 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 [1961]. In *Torcaso v. Watkins,* an appointee to the office of notary public in Maryland had been refused a commission to serve because he would not declare his belief in God and was thus barred from holding office by virtue of the state constitution's declaration of rights provision. The state court held that the constitutional provision was self-executing and required a declaration of belief in God as a qualification for office without need for implementing legislation. The U.S. Supreme Court reversed, expressing the view that the constitutional requirement invaded the appointee's freedom of belief and religion and could not be enforced against him. The Court emphasized that *neither a state nor the federal government can constitutionally force a person to profess a belief or disbelief in any religion,* or pass laws or impose require-

ments which aid all religions as against nonbelievers or aid religion based on a belief in the existence of God as against those religions founded on different beliefs.

**39.** In *Engel v. Vitale,* 370 U.S. 421, 431–432, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 [1962], the Court said:

"Its [the Establishment Clause's] first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and to degrade religion.... The Establishment Clause thus stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a civil magistrate."

**40.** *Engel v. Vitale, supra* note 39, 370 U.S. at 429, 82 S.Ct. at 1266.

777 at top right

Constitution was designed to preserve freedom of worship by prohibiting the establishment or endorsement of any official religion. One of the fundamental purposes of the First Amendment is to protect the people's right to worship as they choose.[41] Implicit in the right to choose freely one's own form of worship is the right of unhindered and unimpeded withdrawal from the chosen form of worship. In *Engel* it was the government that, by advocating one particular form of religious worship, threatened to limit freedom of choice; here, it is the Collinsville Church of Christ that, by denying Parishioner's right to disassociate herself from a particular form of religious belief, is threatening to curtail her freedom of worship according to her choice. Unless Parishioner waived the constitutional right to withdraw her initial consent to be bound by the Church of Christ discipline and its governing Elders, her resignation was a constitutionally protected right. A waiver is the voluntary or intentional relinquishment of a known right.[42] According to Parishioner the process of indoctrination into the Church of Christ did not teach her that the body considers membership to be an insoluble bond of lifetime commitment. She was unaware that becoming a member of the Collinsville Church meant relinquishing her civil right voluntarily to disassociate herself from that body.

The Elders testified that, while the Church of Christ practices "withdrawal of fellowship" as a disciplinary punishment, its biblically grounded beliefs prohibit members from unilaterally withdrawing their allegiance to the church. The Elders never controverted Parishioner's claim that she was not taught the Church's prohibition against withdrawal of membership. Parishioner's testimony must hence be taken as true.

By voluntarily uniting with the church, she impliedly consented to submitting to its form of religious government, but did not thereby consent to relinquishing a right which the civil law guarantees her as its constitutionally protected value. The intentional and voluntary relinquishment of a known right required for a finding of an effective waiver was never established. On the record before us Parishioner—a *sui juris* person—removed herself from the Church of Christ congregation rolls the moment she communicated to the Elders that she was withdrawing from membership.[43]

V

WHEN PARISHIONER WITHDREW HER MEMBERSHIP FROM THE CHURCH OF CHRIST AND THEREBY WITHDREW HER CONSENT TO PARTICIPATE IN A SPIRITUAL RELATIONSHIP IN WHICH SHE HAD IMPLICITLY AGREED TO SUBMIT TO ECCLESIASTICAL SUPERVISION, THOSE DISCIPLINARY ACTIONS THEREAFTER TAKEN BY THE ELDERS AGAINST PARISHIONER, WHICH ACTIVELY INVOLVED HER IN THE CHURCH'S WILL AND COMMAND, WERE OUTSIDE THE PURVIEW OF THE FIRST AMENDMENT

**41.** *Engel v. Vitale, supra* note 39, 370 U.S. at 435, 82 S.Ct. at 1269.

**42.** *Faulkenberry v. Kansas City Southern Ry. Co.,* Okl., 602 P.2d 203, 206–207 [1979] and *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 [1938]. "Waiver" had its origin in civil law before Justice Black in *Johnson* transplanted it into criminal law. In *Cordova v. Hood,* 84 U.S. [17 Wall. 1] 1, 21 L.Ed. 587 [1872], the Court said that "waiver" is a matter of intention as well as action. The party invoking waiver as a bar is required to show that the person against whom the bar is asserted did, at the time of the transaction, have knowledge, actual or constructive, of the existence of his rights and of all the material facts upon which they depend-

ed. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 143, 87 S.Ct. 1975, 1985, 18 L.Ed.2d 1094 [1967]. No one can be bound by a waiver of one's rights unless it was made with full knowledge of the rights intended to be waived. The fact that one knows his rights and intends to waive them must plainly appear. *Universal Gas Co. v. Central Illinois Public Service Co.,* 102 F.2d 164, 168 [7th Cir.1939]. *Cf., Schneckloth v. Bustamonte,* 412 U.S. 218, 243–244, 93 S.Ct. 2041, 2056, 36 L.Ed.2d 854 [1973]. An indispensable ingredient of one's effective waiver is a freely exercised will to relinquish a known right.

**43.** Parishioner's withdrawal was effective not later than upon the Elders' receipt of her resignation letter of September 25, 1981.

PROTECTION AND WERE THE PROPER SUBJECT OF STATE REGULATION.[44]

■ Parishioner claims that the Elders invaded her privacy when they wrongfully publicized private facts about her life [45] and that this invasion caused her severe emotional stress. After she wrote a letter to the Elders unequivocally withdrawing her membership from the Church of Christ, the Elders continued their disciplinary actions against her. During Sunday services the Elders read to the congregation those scriptures which Parishioner had violated. This exposure of her private life, done without her consent, was unprotected by the First Amendment; the Elders' conduct became hence amenable to state regulation through the imposition of tort liability.

Conduct conforming to and motivated by one's religious beliefs is not always immune from governmental regulation:

"[A] determination of what is a "religious" belief or practice entitled to constitutional protection may present a most delicate question, [but] *the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which*

**44.** By limiting Parishioner's recovery to those acts that occurred during postwithdrawal stages, we have narrowed the issue in this case to whether the Elders are liable under theories of invasion of privacy and intentional infliction of emotional distress for words which they have spoken. The parties' briefs argued, and we have concluded, that the words in question constitute religious speech. Accordingly, we have relied upon the religion clauses of the First Amendment in analyzing the degree of protection these words deserve.

The United States Supreme Court has used the First Amendment freedom-of-speech protections to limit recovery in lawsuits *in which words alone* are at issue. See *New York Times Co. v. Sullivan, supra* note 14. Thus, in state *defamation* actions neither public officials nor public figures may recover for defamatory words relating to their official conduct unless they prove that the words were spoken with "malice." See *Sullivan, supra* note 14, 376 U.S. at 279, 84 S.Ct. at 726; see also *Curtis Publishing Co. v. Butts, supra* note 42 (the *Sullivan* rule was extended to public *figures*). We know of no such limitations on state causes of action for invasion of privacy or intentional infliction of emotional distress—even when, as in the instant case, those causes of action are based upon words alone.

Furthermore, it is evident from the United States Supreme Court's reasoning in defamation cases that the protection afforded statements made about public officials or figures is grounded in the fact that those statements are of *public concern:*

"[P]ermitting recovery of presumed and punitive damages in defamation cases absent a showing of 'actual malice' does not violate the First Amendment when the defamatory statements do not involve matters of public concern."

*Dun and Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 763, 105 S.Ct. 2939, 2947, 86 L.Ed.2d 593 [1985]. The Court reasoned that "not all speech is of equal First Amendment importance.... [S]peech on 'matters of public concern' ... is 'at the heart of the First Amendment's protection' * * * [while] speech on matters of purely private concern is of less First Amendment concern." *Greenmoss, supra,* 472 U.S. at 758–759, 105 S.Ct. at 2944–2945 (citations omitted). Clearly, the Elders' statements were of "purely private concern." Even under the United States Supreme Court's rulings regarding defamation causes of action, these statements would be "of less First Amendment concern." Constitutional law protections will be extended regardless of the label placed on the particular cause of action. *Sullivan, supra* note 14, 376 U.S. at 269, 84 S.Ct. at 720. We could thus not allow through our invasion of privacy and intentional infliction of emotional distress causes of action which the First Amendment precludes. In re-evaluating our analysis in the instant case, we conclude that we have not violated this fundamental precept.

The tort of defamation, which has been somewhat limited by the United States Supreme Court, protects individuals' *reputations.* On the other hand, invasion of privacy protects against *unreasonable interferences with individuals' solitude,* while intentional infliction of emotional distress protects against *outrageous conduct.* Accordingly, the role that the First Amendment plays in protecting speech which is attacked through defamation is quite different from the role it plays in protecting speech which is attacked by way of these other torts. We are hence satisfied that in analyzing the Elders' speech under the religion clauses of the First Amendment—to the exclusion of defamation considerations—we have afforded it the proper First Amendment protection.

**45.** *McCormack v. Oklahoma Pub. Co.,* Okl., 613 P.2d 737, 739–740 [1980], and *Eddy v. Brown,* Okl., 715 P.2d 74, 77–78 [1986], give the guidelines to be followed when adjudicating the tort claims of invasion of privacy and intentional infliction of emotional distress.

*society as a whole has important interests."* [46] [Emphasis added.]

Disciplinary practices involving members of an ecclesiastical association, which do not pose a substantial threat to public safety, peace or order, are unquestionably among those hallowed First Amendment rights with which the government cannot interfere. If these sectarian matters were easily subject to civil adjudication and liability by secular judicature, the First Amendment shield under which "many types of life, character, opinion and belief can develop unmolested and unobstructed" [47] would be rendered impotent.

First Amendment protection does not extend to all religiously-motivated disciplinary practices in which ecclesiastical organizations might engage. [48] By its very nature, ecclesiastical discipline involves both church and member. It is a means of religious expression as well as a means of ecclesiastically judging one who transgresses a church law which one has consented to obey. The right to express dissatisfaction with the disobedience of those who have promised to adhere to doctrinal precepts and to take ecclesiastically-mandated measures to bring wayward members back within the bounds of accepted behavior, are forms of religious expression and association which the First Amend-

ment's Free Exercise Clause was designed to protect and preserve. And yet the constitutionally protected freedom to impose even the most deeply felt, spiritually-inspired disciplinary measure is forfeited when the object of "benevolent" concern is one who has terminated voluntary submission to another's supervision and command. [49]

While the First Amendment requires that citizens be tolerant of religious views different from and offensive to their own, [50] it surely does not require that those like Parishioner, who choose not to submit to the authority of any religious association, be tolerant of that group's attempts to govern them. Only those "who unite themselves" in a religious association impliedly consent to its authority over them and are "bound to submit to it." [51] Parishioner voluntarily joined the Church of Christ and by so doing consented to submit to its tenets. When she later removed herself from membership, Parishioner withdrew her consent, depriving the Church of the power actively to monitor her spiritual life through overt disciplinary acts. No real freedom to choose religion [52] would exist in this land if under the shield of the First Amendment religious institutions could impose their will on the unwilling and claim immunity from secular judicature for their tortious acts.

**46.** *Wisconsin v. Yoder*, 406 U.S. 205, 215–216, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 [1972].

**47.** See *Cantwell v. State of Connecticut, supra* note 4, 310 U.S. at 310, 60 S.Ct. at 906.

**48.** In *Madsen v. Erwin*, 395 Mass. 715, 481 N.E.2d 1160 [1985], a church employee and member brought suit against the First Church of Christ, Scientist of Boston, for wrongful discharge and various other torts allegedly committed in the process of firing her from her job at the Christian Science Monitor. Ms. Madsen alleged that "her employment was terminated because of her sexual preference and refusal to '[seek] healing' through the Church." *Madsen v. Erwin, supra* 481 N.E.2d at 1164. Adhering to the doctrine of ecclesiastical abstention developed in *Serbian Eastern Orthodox Diocese, Etc. v. Milivojevich, supra* note 22, 426 U.S. at 709, 96 S.Ct. at 2380, the court held that the church's decision to terminate Ms. Madsen's employment was a religious decision which it could not constitutionally adjudicate. Recognizing the importance of First Amendment freedoms as well as the equally important rule that the rights of

religion are not beyond the reach of the civil law, the court went on to hold that Ms. Madsen could replead her remaining tort claims against the church:

"*Under the banner of the First Amendment provisions on religion, a clergyman may not with impunity defame a person, intentionally inflict serious emotional harm on a parishioner, or commit other torts.*" [Emphasis added.]

*Madsen v. Erwin, supra* 481 N.E.2d at 1167; see also, *Bear v. Reformed Mennonite Church*, 462 Pa. 330, 341 A.2d 105, 107–108 [1975].

**49.** But see, *Tort Claims against Churches and Ecclesiastical Officers: The First Amendment Considerations*, 89 W.Va.L.Rev. 1, 101–103 [1986].

**50.** See *Cantwell v. State of Connecticut, supra* note 4, 310 U.S. at 310, 60 S.Ct. at 906.

**51.** See *Watson v. Jones, supra* note 15, 80 U.S. (13 Wall.) at 729.

**52.** See text in *supra* note 35.

A federal appellate court has held that the Jehovah's Witness Church's practice of "shunning," whether directed at current or former transgressing members, is protected First Amendment activity which does not "constitute a sufficient threat to the peace, safety, or morality of the community as to warrant state intervention."[53]  In *Paul* a Jehovah's Witness believer became disillusioned with the church, withdrew her membership and subsequently moved to another state.  When she visited her old neighborhood a few years later, her Jehovah's Witness friends would not speak to her; the church had instructed them to shun all "withdrawn" members.

Ms. Paul sued the Church, claiming that by shunning her, it had defamed her, caused her severe emotional distress and invaded her privacy.  Stating that while a court could, in theory, "examine the question whether the shunning of a former member of a church is, in itself, tortious," the court instead "follow[ed] the practice of Washington courts which safeguard the free exercise of religion through recognition of substantive defenses to torts, rather than by negating the plaintiff's cause of action itself."[54]  The court reasoned that "[c]hurches are afforded great latitude when they impose discipline on members or former members."[55]  It found that "shunning" is a form of religious expression which the Free Exercise Clause protects. The Witnesses' practice of shunning is privileged religious conduct, entitled to absolute First Amendment protection from governmental interference.  The court held that because the protected practice of shunning did not present a threat to the peace, safety, or morality of the community,[56] state intervention in the form of tort liability was not justified.

The facts here, which involve the Elders' postwithdrawal conduct, are clearly distinguishable from those in *Paul*.  While both cases address the tort implications of a church's decision to impose disciplinary measures upon a former member, the form of discipline is notably different in each case.  At bar, the Elders, in conformity to their interpretation of biblical mandate, informed four other area Church of Christ congregations within Parishioner's community of her "sinful" acts.  After she had withdrawn her membership from the Church and repeatedly requested the Elders to refrain from exposing her private life to the congregations, they proceeded to share her transgressions with a significant number of her fellow citizens.  Although Parishioner had withdrawn her consent to submit to the Church of Christ's prohibition of "fornication," the Elders continued actively to discipline and punish her for past disobedience of its doctrinal precepts.

In *Paul* a former member deliberately rejected the faith and beliefs of the Jehovah's Witness Church and was thus shunned.  The Elders admonished the members of the church not to speak to Ms. Paul, and they obeyed.  While Ms. Paul had withdrawn her membership and thus her consent to submit to the authority of the Jehovah's Witness Church, the act of discipline which it carried out against her was—unlike that in the instant case—a form of rejection and exclusion which did not call for her consent:

> "The members of the Church Paul decided to abandon have concluded that they no longer want to associate with her. We hold that they are free to make that choice."[57]

The Elders' postresignation conduct in *Paul* was passive.  Their disassociation from Ms. Paul through shunning was merely a reiteration of her prior rejection, not an active attempt to involve her in the religious practices of a church whose precepts she no longer followed.  The church's

**53.** *Paul v. Watchtower Bible & Tract Soc. of New York, supra* note 26 at 883.

**54.** *Paul v. Watchtower Bible & Tract Soc. of New York, supra* note 26 at 879.

**55.** *Paul v. Watchtower Bible & Tract Soc. of New York, supra* note 26 at 883.

**56.** *Paul v. Watchtower Bible & Tract Soc. of New York, supra* note 26 at 883.

**57.** *Paul v. Watchtower Bible & Tract Soc. of New York, supra* note 26 at 883.

decision to turn away from her was protected under the First Amendment as a passive exercise of religious freedom, the legitimacy of which was not grounded in her prior acquiescence.

For purposes of First Amendment protection, religiously-motivated disciplinary measures that merely *exclude* a person from communion are vastly different from those which are designed to *control* and *involve*. A church clearly is constitutionally free to exclude people without first obtaining their consent. But the First Amendment will not shield a church from civil liability for imposing its will, as manifested through a disciplinary scheme, upon an individual who has not consented to undergo ecclesiastical discipline. The court in *Paul* stated that "[c]ourts generally do not scrutinize closely the relationship among members (*or former members*) ...," and that "[c]hurches are afforded great latitude when they impose discipline on members or former members," [58] [emphasis added] but it provided no support for this view. Regardless of our disagreement with the court's refusal in *Paul* to distinguish between "former" and "present" church members when assessing a church's freedom to visit religious discipline, it is apparent that the stated rationale did not form the basis of the court's holding. We believe that the conclusion reached in *Paul* and our holding today are entirely consistent and easily reconcilable.

In order to prevail on her claim for invasion of privacy by publication of private facts, Parishioner had to prove the four elements of that tort. She had the burden of showing that the Elders' statements (1) were highly offensive to a reasonable person, (2) contained private facts about Parishioner's life, (3) were a public disclosure of private facts and (4) were not of legitimate concern to the Church of Christ con-

gregation. The Elders contend that elements three and four were not met. In *Eddy v. Brown* this court recently stated that Okalahoma applies the Restatement (Second) of Torts when assessing whether a statement made to a group of people constitutes "publicity." [59]

In *Eddy* a statement to a limited number of Eddy's coworkers that he was undergoing psychiatric treatment did not amount to "publication" for purposes of invasion of privacy. The case at bar presents a different factual scenario. Here, the Elders read scriptures that implicated Parishioner's private life to a church congregation comprising five percent of Parishioner's hometown population. This group of people constitutes, in many respects, Parishioner's public. Parishioner proved element number three by showing that the Elders' actions amounted to a publication. The Elders' contentions are hence without merit.

■ To satisfy element number four of invasion of privacy by publication of private facts, Parishioner had to prove that the publication was not of legitimate concern to the congregation. In *McCormack v. Oklahoma Pub. Co.*,[60] our first case to adopt "publication of private facts" as a means of invading another's privacy, McCormack claimed that Oklahoma Publishing Company [OPUBCO] invaded his privacy by publicizing an article that discussed his past involvement in an illegal gambling operation. Deciding in favor of OPUBCO, this court stated that the publication was not proven to be unreasonable. McCormack did not allege facts sufficient to show either that OPUBCO's statements were not already of public record or that they were not of legitimate concern to the public.

---

**58.** *Paul v. Watchtower Bible & Tract Soc. of New York, supra* note 26 at 883.

**59.** In *Eddy v. Brown, supra* note 45 at 78, the court stated:

" 'Publicity' means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to

become one of public knowledge.... The difference is not one of the means of communication ... [but] one of a communication that reaches, or is sure to reach the public." See also Restatement (Second) of Torts, Ch. 28A, Intrusion Upon Seclusion, § 652B, comment (a) [1977].

**60.** *Supra* note 45.

In *Eddy* this court refined the elements required to prove invasion of privacy by publication of private facts. *Eddy* articulated those elements as (1) publicity, (2) which is unreasonable and (3) which is given as a private fact. Because the statements made to Eddy's coworkers did not constitute a publication, this court was not required to decide whether these statements were unreasonable and thus not of legitimate concern to the public.

■ According to the Restatement (Second) of Torts, the "legitimate public concern" requirement is based on the policy that the public has a proper interest in learning about such matters.[61] To constitute an invasion of privacy, a publication must be highly offensive to a reasonable person and of no legitimate concern to the public.

The Elders' testimony indicates that one of the purposes served by withdrawal-of-fellowship proceedings is to "keep the [accused member's] sin from spreading" throughout the entire congregation. In order to protect the Collinsville Church and other area Churches of Christ from Parishioner's adverse influence, those congregations were made aware of the transgressions she admitted to having committed. In *Redgate v. Roush*[62] the court dealt with a Church of Christ member, sometimes acting as pastor, who sued the elders of the Wilmington Church of Christ for defamation. Because he preached sermons which contravened the church doctrine, the elders of that church withdrew fellowship from him and circulated articles in the church paper which warned of his unwor-

thiness as a Church of Christ member and pastor.

As in the case at bar, the Elders in *Redgate* defended their decision to publish the article denouncing Redgate as "void of the spirit of Christ" on the grounds that the information legitimately concerned the congregations. The court held the Elders had a "qualified privilege" to communicate the reasons for the disciplinary withdrawal-of-fellowship proceedings which they initiated against Redgate.[63]

While *Redgate* involved a congregation's concerns with the credentials of a person who might have attempted to continue preaching within the affected denomination, the case at bar involves a congregation's concern with the sins of a person who is no longer a church member. In *Redgate* the congregation had a legitimate and reasonable concern for the transgressor's actions; in the case at bar it did not. In *Redgate* the congregation had a common interest in being informed about the questionable conduct of one among them who expressed the desire to continue ministering to them or to one of their neighboring assemblies. Here, Parishioner expressed no interest in continuing her association with the Collinsville or any other Church of Christ. She removed herself from membership and thus posed no threat of continued adverse influence on any Church of Christ congregation.

■ Because the disciplinary actions taken by the Elders after Parishioner's resignation are not deserving of First Amendment protection, they were the proper subject of her claim for intentional infliction of emotional distress. This delict, also known

**61.** Restatement (Second) of Torts, Ch. 28A, Publicity Given to Private Life, § 652D, comment (d) [1977].

**62.** 61 Kan. 480, 59 P. 1050 [1900].

**63.** In *Redgate v. Roush, supra* note 62, 59 P. at 1050–1051, the court noted:
"They were officers of the church, and were concerned in its welfare; the conduct and character of the plaintiff [Redgate] as their pastor had become a subject of official inquiry; and it has been found that he was 'void of the spirit of Christ,' insubordinate, disorderly, and unworthy of the confidence of the

brotherhood. The result of their inquiry was a matter of interest, not only to them and the church at Wilmington, but to other members of their church organization throughout the country. If the plaintiff [Redgate] was unworthy or unfit to discharge the sacred functions of his high calling, the defendants [Elders], interested in the welfare of the denomination throughout the land, would appear to have been justified in warning other members and congregations of that organization to whom the plaintiff [Redgate] might offer his services as pastor."

as the "tort of outrage," is recognized in Oklahoma and is governed by the parameters expressed in *Eddy v. Brown.*[64] According to *Eddy*, the "extreme" and "outrageous" nature of the parties' conduct should not be considered in a vacuum.[65] The "outrageousness" of the Elders' postwithdrawal conduct was properly scrutinized in accordance with the *Eddy* test. The Elders knew that Parishioner had withdrawn from the Church and yet they continued to discipline her as though she were a current and active member. Among the Collinsville congregation were Parishioner's friends and fellow townspeople. Parishioner expressed her apprehension to the Elders and requested that they not mention her name to the congregation except to announce her withdrawal. In this setting, disciplining Parishioner as if she were still a member by communicating her sin of fornication could be found to be "beyond all bounds of decency." We hence hold there is competent evidence to support the jury's conclusion that the Elders had intended to inflict emotional harm on Parishioner.

In *Paul* the court held that the intangible, emotional "harms suffered by Paul as a result of her shunning ... [were] clearly not of the type that would justify the imposition of tort liability for religious conduct."[66] It reasoned that "[w]ithout society's tolerance of offenses to sensibility, the protection of religious differences mandated by the first amendment would be meaningless."[67] While we agree that First Amendment freedoms could be jeopardized by the imposition of tort liability for every religious act which offends, we are equally

certain that some religiously motivated acts are actionable because they fall outside the scope of First Amendment protection and that those acts would indeed be the proper subject of secular judicature. The Elders' postwithdrawal disciplinary measures were imposed without Parishioner's consent and were thus undeserving of First Amendment protection. Imposing tort liability upon the Elders for their unprotected acts does not threaten our constitutionally shielded religious freedoms. We hold that Parishioner, an unwilling, nonconsenting subject of a church's disciplinary actions, has an actionable claim against the Elders and the Church of Christ for the tort of intentional infliction of emotional distress.

## VI

AFTER PARISHIONER WITHDREW HER MEMBERSHIP FROM THE COLLINSVILLE CHURCH OF CHRIST, THE ELDERS WERE NEITHER ABSOLUTELY NOR CONDITIONALLY PRIVILEGED TO PUBLICIZE PRIVATE FACTS ABOUT HER LIFE.

According to the Restatement (Second) of Torts, the "absolute" and "conditional" privileges to publicize defamatory matter apply to causes of action under invasion of privacy.[68] An absolute privilege will provide a defense to a claim of invasion of privacy by publication of private facts if the complainant consented to the publication. Parishioner's withdrawal from the Collinsville Church of Christ put an end to her membership in that religious body. The law presumes that during the

---

64. In *Eddy v. Brown, supra* note 45 at 76, the court stated:

"It is the trial court's responsibility initially to determine whether the defendant's conduct may reasonably be regarded as sufficiently extreme and outrageous to meet the [Restatement (Second) of Torts] § 46 standards."

65. In *Eddy v. Brown, supra* note 45 at 77, citing the Restatement (Second) of Torts, Ch. 2, The Interest in Freedom from Emotional Stress, § 46, comment (d) [1977], the court held:

"Conduct which, though unreasonable, is neither 'beyond all possible bounds of decency' in the setting in which it occurred, nor is one that can be 'regarded as utterly intolerable in

a civilized community,' falls short of having actionable quality. Hurt feelings do not make a cause of action under the tort-of-outrage rubric."

66. *Paul v. Watchtower Bible & Tract Soc. of New York, supra* note 26 at 883.

67. *Paul v. Watchtower Bible & Tract Soc. of New York, supra* note 26 at 883.

68. Restatement (Second) of Torts, Ch. 28A, Absolute Privileges, § 652F, comment (a), and Conditional Privileges, § 652G, comment (a) [1977].

time she was a member of the church *she voluntarily submitted to all known tenets of congregational discipline.* This principle is, of course, but an adaptation of the general common-law doctrine known as *volenti non fit injuria.*[69]

We have determined that when Parishioner withdrew from the Church by her September 25 letter she effectively revoked any consent upon which the Elders could have based a defense of "absolute privilege" to share Parishioner's private life with the Collinsville congregation.[70] "Conditional privileges" to publicize personal matters about another person's life are not based on or derived from that person's consent. There are certain "occasions" which give rise to a conditional privilege to publicize private facts about another person.[71] If the publication is made on a privileged occasion and the privilege is not abused, the "publisher" is not liable.[72]

Under § 596[73] of the Restatement (Second) of Torts a publication is conditionally privileged if the "circumstances [under which the information is published] lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know." The Elders claim that under this section, the worship service, during which facts about Parishioner's private life were publicized, was an "occasion" that provided them with the privilege to communicate this information to the Collinsville congregation.

Comment (e) of § 596 of the Restatement (Second) of Torts, specifically addresses "privileged occasions" in the context of religious associations.[74] Under this "common interest" type of "privileged occasion," the

---

**69.** The maxim *volenti non fit injuria,* which means that a person who consents to an act is not wronged by it, is predicated on the theory of knowledge and appreciation of the danger and voluntary assent to the risk associated with it. The *volenti* doctrine came from Roman law. It found its way into the common-law tradition in Priestley v. Fowler, 3 M. & W. 1, 150 Eng.Reg. 1030 [1837]; see *Thomas v. Holliday,* Okl., 764 P.2d 165, 169 [1988]; see also, *Walsh v. West Coast Coal Mines,* 31 Wash.2d 396, 197 P.2d 233, 238–239 [1948] and *Lyons v. Redding Construction Company,* 83 Wash.2d 86, 515 P.2d 821, 822–826 [1973]; for Oklahoma cases applying the doctrine, see *Davis v. Whitsett,* Okl., 435 P.2d 592, 599 [1967]; *Briscoe v. Oklahoma Natural Gas Company,* Okl., 509 P.2d 126, 129 [1973] and *Centric Corp. v. Morrison–Knudsen Co.,* Okl. 731 P.2d 411, 419 [1986].

**70.** In contrast, the Elders did have an "absolute privilege" to withdraw fellowship from Parishioner. The Elders were absolutely privileged, under the law of torts as set forth in the Restatement (Second) of Torts § 652F, to discipline Parishioner during the time she was a member of the Collinsville Church of Christ. "Consent" is the basis for the protection from civil liability upon which one with an absolute privilege relies; joining the church was sufficient evidence of Parishioner's consent.

Parishioner understood that, as a wayward member of the Collinsville Church of Christ, she was subject to the disciplinary withdrawal-of-fellowship proceedings. Her knowing consent to such disciplinary action provided the Elders with complete protection from liability under the absolute privilege defense. This absolute privilege could be lost only if it were abused through flagrant misconduct, such as intentionally taking advantage of one's highly influential position in a relationship of trust and confidence.

Under the First Amendment, the Elders were granted another form of absolute religious privilege to discipline Parishioner during her membership with the church. Unlike the civil law privilege which, unless abused, protected the Elders from civil liability, this constitutional privilege absolutely shielded the Elders' actions from any civil court review unless those actions threatened the public safety, peace or order. See *supra* note 16.

**71.** "Occasions making a publication conditionally privileged afford a protection based upon a public policy that recognizes that it is essential that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public." Restatement (Second) of Torts, Ch. 25 § 592A, Conditional Privileges, Scope Note.

**72.** Restatement (Second) of Torts, Ch. 25, § 599, comment (a).

**73.** See also *infra* note 74.

**74.** Comment (e) of § 596, Restatement (Second) of Torts, states:

"The common interest of members of religious, fraternal, charitable or other non-profit associations, whether incorporated or unincorporated, is recognized as sufficient to support a privilege for communications among themselves concerning the qualifications of the officers and members and their partic-

Elders were not privileged to publicize private facts about Parishioner's life.[75] Because Parishioner was neither a "present" nor a "prospective" church member at the time of the Elders' publication, the members of the Collinsville congregation did not share the sort of "common interest" in Parishioner's behavior that would render the occasion of the publication "privileged."[76] Communicating unproven allegations of a present or prospective member's misconduct to the other members of a religious association is a privileged occasion because the members have a valid interest in and concern for the behavior of their fellow members and officers. The Elders' defense of "privilege," as it pertains to their actions occurring after Parishioner's withdrawal of membership, is without merit.

## VII

## CONCLUSION

Among the three verdict forms,[77] each of which listed Parishioner's invasion of privacy and intentional infliction of emotional distress claims, the award for $205,000 represents the single largest actual damage amount awarded to Parishioner; the $185,000 figure represents the single largest

ipation in the activities of the society. This is true whether the defamatory matter relates to alleged misconduct of some other member that makes him undesirable for continued membership, or the conduct of a prospective member. So too, the rule is applicable to communications between members and officers of the organization concerning the legitimate conduct of the activities for which it was organized. The rule, however, does not afford protection to communications made by a non-member to members of the organization, nor does it afford protection to communications made by a member to one who is neither a present nor a prospective member...."

**75.** *First Baptist Church of Glen Este v. State of Ohio, supra* note 18 at 683.

**76.** In *Paul v. Watchtower Bible & Tract Soc. of New York, supra* note 26 at 883, the court stated that "[c]hurches are afforded great latitude when they impose discipline on *members or former members*" [emphasis added], suggesting that religious discipline is protected First Amendment conduct regardless of whom it is imposed upon. While the issue in *Paul* was whether religiously motivated conduct was protected by the First Amendment and was thus immune from civil tort liability, the issue in the instant case is whether religious conduct that is deemed tortious is nonetheless immune from liability on the basis of an "absolute" or "conditional" privilege. Once we determined that the Elders' postwithdrawal conduct was subject to tort liability, our next question was to decide whether they were "privileged," under tort law, to act as they did. For purposes of this inquiry, the Restatement (Second) of Torts, adopted in Oklahoma, has drawn a distinction between "former" and "present" members. The different privilege issues herein presented, not our vehement disagreement with the Ninth Circuit's opinion that religious disciplinary acts imposed upon former and present members are equally protected by the First Amendment, guide our discussion of the defenses available for tortious

religious conduct. See also, *Rasmussen v. Bennett,* 741 P.2d 755, 758 [Mont.1987].

**77.** Identical verdict forms were submitted for each of the three Elders. The verdict form stated:

"We, the jury, impaneled and sworn in the above entitled cause, do upon our oaths, find the issues as follows:

Check one box for each section

1. ☐ In favor of the plaintiff, and against this defendant on her cause of action for publication of private facts, and fix recovery at $_____ actual damages, and $_____ punitive damages.

☐ In favor of this defendant and against the plaintiff on her cause of action for publication of private facts.

2. ☐ In favor of the plaintiff, and against this defendant on her cause of action for intrusion upon seclusion, and fix recovery at $_____ actual damages, and $_____ punitive damages.

☐ In favor of this defendant and against the plaintiff on her cause of action for intrusion upon seclusion.

3. ☐ In favor of the plaintiff and against this defendant on her cause of action for intentional infliction of emotional distress, and fix recovery at $_____ actual damages, and $_____ punitive damages.

☐ In favor of this defendant and against the plaintiff on her cause of action for intentional infliction of emotional distress."

The jury returned the following verdict against each Elder by marking the appropriate box next to the stated theory of liability and filling in the amount of the award made in each instance:

1. *Publication of private facts —* $205,000 actual damages and $185,000 punitive damages.

2. *Intrusion upon seclusion —* $114,000 actual damages and $120,000 punitive damages.

3. *Intentional infliction of emotional distress —* $122,000 actual damages and $81,000 punitive damages.

punitive damage amount awarded to Parishioner. While the case was submitted to the jury for a separate verdict on each of Parishioner's three theories, the trial judge determined, and the parties stipulated, that Parishioner could recover only the highest amount awarded her for any of her three theories.[78] *The damages awarded to Parishioner represent recovery for the Elders' allegedly tortious acts occurring both prior to and after Parishioner withdrew her Church of Christ membership.* We have determined that Parishioner cannot recover for the disciplinary actions of the Elders which occurred prior to her withdrawal from the church. Conversely, Parishioner may recover only for those postwithdrawal acts of the Elders which are proven to have been tortious. Because it is impossible to separate on review Parishioner's recovery for the injury occasioned her by the prewithdrawal acts from that which stems from postwithdrawal harm,[79] we now reverse and remand for new trial.[80]

On remand, the trial court may consider the postwithdrawal tortious acts as not immune from secular judicature. For the commission of acts which occurred after Parishioner withdrew her church membership, the Elders are to be treated as any other secular individual. Among potentially tortious postwithdrawal acts was the communication of Parishioner's religious transgressions to both the Collinsville and to the other four area Church of Christ congregations. Parishioner's theories of recovery include but are not necessarily limited to invasion of privacy by publication of private facts and intentional infliction of mental distress (tort of outrage).

The trial court's judgment is accordingly reversed and the cause remanded for new trial to be confined to actionable postwithdrawal conduct.

HARGRAVE, C.J., and LAVENDER, DOOLIN and SUMMERS, JJ., concur.

ALMA WILSON and KAUGER, JJ., concur in part and dissent in part.

HODGES and SIMMS, JJ., dissent.

KAUGER, Justice, concurring in parts I, V; concurring in result in parts II, IV, VI, concurring in part, dissenting in part in parts III, and VII.

There are three reasons why the jury verdict should be affirmed: 1) Because it

---

**78.** Because the parties below stipulated that a single recovery for the Parishioner's three separately plead theories of recovery would be sufficient, it is not the proper place of this court to determine, for purposes of retrial, how many different torts can be based on the facts disclosed by the record.

**79.** We need not decide whether the record discloses the commission of one or more tortious acts. The parties stipulated and the trial judge determined that the highest amount awarded to Parishioner for the three causes of action submitted to the jury would suffice to compensate her for damage from all three torts.

**80.** In *O'Neil v. Schuckardt,* 112 Idaho 472, 473, 733 P.2d 693, 694 [1987], a husband brought suit against the Bishop of Fatima Crusade Church and the Church itself, "for alienation of his wife's affections and for invasion of his, his wife's and his childrens' [sic] privacy." The jury rendered a $1,000,000.00 verdict in favor of the husband and his children, but the trial judge granted the Church's motion for judgment notwithstanding the verdict. On appeal the Supreme Court of Idaho abolished the cause of action for alienation of affections and thus affirmed the trial court's ruling as to that claim.

The Court reversed the trial court's ruling on the husband's invasion of privacy claim, noting that "one does not, under the guise of exercising religious beliefs, acquire a license to wrongfully interfere with the familial relationships." *O'Neil, supra* 112 Idaho at 479, 733 P.2d at 700, quoting with approval from *Carrieri v. Bush,* 69 Wash.2d 536, 419 P.2d 132, 137 [1966].

While the court reinstated the $50,000.00 originally awarded to each of the children for invasion of privacy, it remanded the case for retrial of the husband's like claim. In an analysis similar to the one used in the case at bar, the Idaho Supreme Court stated that because the record and the special verdict forms made it impossible to determine what portion of the husband's $250,000.00 award represented recovery for his cause of action for alienation of affections, and what part of it represented recovery for his cause of action for invasion of privacy, the award could not stand and there would have to be a new trial on his invasion-of-privacy claim. The court followed the same reasoning in addressing the $500,000.00 punitive damage award, holding that it could not stand because it was impossible to determine what portion thereof was awarded on the basis of the abolished cause of action for alienation of affections.

appears that there were material questions of fact, and it does not appear beyond doubt that the parishioner could have proven pre-withdrawal acts entitling her to relief, entry of summary judgment would have been premature; 2) The Okla. Const., art. 1, § 2 provides bona fide, separate, adequate and independent grounds which support the jury verdict; and 3) Based on the stipulation of the parties, the instructions to the jury, and the jury verdict, the verdict on appeal involves only post-withdrawal acts.

## I

The opinion states "that the parishioner has not had an opportunity to present specific evidence concerning whether the Elders' pre-withdrawal acts were a threat to the public safety, peace or order." Nevertheless, the majority is "convinced that affording the parishioner an opportunity to do so would be a meaningless gesture." In effect, the opinion holds that the trial court erred when it refused to enter summary judgment in favor of the Elders on this issue. It concludes that "the law presumes that during the time the parishioner was a member of the church she voluntarily submitted herself to all known tenets of congregational discipline." The opinion impliedly determines that the presumption is irrebuttable. Nevertheless, the presumption that the appellee submitted to all doctrinal teaching is inconclusive from the facts as presented in the opinion. It is unrefuted that the appellee "was not taught the Church's prohibition against withdrawal of membership."

The freedom to act upon religious beliefs—to engage in religious activity—is not absolute as is the right to hold those beliefs. Activity may be curtailed in some circumstances for the protection of sufficiently compelling societal interest.[1] In *Cantwell v. State of Connecticut*, 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1218 (1940), the United States Supreme Court said:

"The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws. The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society ...."

In *Buckner v. General Motors Corp.* 760 P.2d 803, 812 (Okla.1988), the Court held:
"Even when the basic facts are undisputed, motions for summary judgment should be denied, if under the evidence, reasonable persons might reach different inferences or conclusions from the undisputed facts. Summary judgment is proper only when the pleadings, affidavits, deposition, admissions or other evidentiary materials establish that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. In appraising the sufficiency of a petition, the accepted rule is that a petition should not be dismissed for failure to state a cause of action unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle her to relief."

Premature entry of summary judgment would have been improper. Fundamental fairness in the litigation process cannot be afforded except within the framework of orderly procedure.[2]

---

1. *Forest Hills Early Learning Center, Inc. v. Lukhard,* 728 F.2d 230, 240 (4th Cir.1984).

2. *Pryse Monument Co. v. District Court,* 595 P.2d 435, 438 (Okla.1979). *LaBarge v. Zebco, et al.,* 769 P.2d 125 (Okla.1988), (Opala, J. dissenting).

## II

The opinion bases its reasoning and its analysis on the first amendment to the United States Constitution and its progeny in finding that the elders' pre-withdrawal acts must threaten the public safety, peace or order. The federal constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...."[3] Although the Oklahoma Constitution parrots the United States Constitution in many instances, its provision for religious liberty does not. The Okla.Const., art. 1, § 2, provides that *"perfect toleration of religious sentiment shall be secured, and no inhabitant of the State shall ever be molested in person or property on account of his or her mode of religious worship ..."*[4]

States, in the exercise of their sovereign power, may afford more expansive individual rights and liberties than those conferred by the United States Constitution.[5] State statutes or state constitutions which afford greater individual rights or liberties than the federal constitution must be determined by following state law. It is only when state law provides less protection that the question must be determined by federal law. The people of this state are governed by the Oklahoma Constitution, and when it grants a right or provides a principle of law or procedure beyond the protections supplied by the federal constitution, it is the final authority.[6] This is so

3. The First Amendment to the Constitution of the United States provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

4. The Okla. Const., art. I, § 2, states:

"Perfect toleration of religious sentiment shall be secured, and no inhabitant of the State shall ever be molested in person or property on account of his or her mode of religious worship; and no religious test shall be required for the exercise of civil or political rights. Polygamous or plural marriages are forever prohibited."

The state of Pennsylvania is another example of state constitutions providing more explicit guarantees of individual rights:

"All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience and no preference shall ever be given by law to any religious establishments or modes of worship." Pa. Const., art. I, § 3.

5. *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741, 752 (1980) (involved the right of free expression under the first amendment and the right to petition the government for a redress of grievances); *Turner v. City of Lawton,* 733 P.2d 375, 378–79 (Okla.1986), cert. denied, 483 U.S. 1007, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987). The

Oklahoma Constitution also provides greater rights than those secured by the United States Constitution in the arena of parental rights, *In the matter of A.E., E.E., E.E., R.E., A.E.,* and *E.E. v. Oklahoma,* 743 P.2d 1041, 1046–48 (Okla. 1987). *Queen v. W. Va. Univ. Hosp.,* 365 S.E.2d 375, 383 (W.Va.1987) (involved wrongful, termination and due process); *People, ex rel. Arcara v. Cloud Books, Inc.,* 68 N.Y.2d 553, 510 N.Y. S.2d 844, [846–47], 503 N.E.2d 492, 494–95 (1986) (involved first amendment rights and public nuisance); *W. Pa. Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins.,* 512 Pa. 23, 515 A.2d 1331, 1333 (1986) (involved first amendment rights and political solicitation); *Butte Community Union v. Lewis,* 712 P.2d 1309, 1313 (Mont.1986) (involved the right to receive welfare benefits); *Pfost v. State,* 713 P.2d 495, 500 (Mont.1985) (involved the right to petition the government for redress of grievances); *Cheyenne Airport Bd. v. Rogers,* 707 P.2d 717, 726 (Wyo.1985), cert. dismissed, 476 U.S. 1110, 106 S.Ct. 1961, 90 L.Ed.2d 647 (1986) (involved zoning ordinance); *Hawaii Hous. Auth. v. Lyman,* 704 P.2d 888, 896 (Hawaii 1985) (involved condemnation action); *Fischer v. Dep't of Pub. Welfare,* 509 Pa. 293, 502 A.2d 114, 121 (1985) (involved public funding of abortions); *Right to Choose v. Byrne,* 91 N.J. 287, 450 A.2d 925, 932 (1982) (involved the funding of abortions); *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859, 864 (1979) (involved public school financing); *Fasulo v. Arafeh,* 173 Conn. 473, 378 A.2d 553–54 (1977) (involved confinement of mental patients); *Planned Parenthood v. Cannizzaro,* 204 N.J.Super.Ct. 531, 499 A.2d 535, 538 (Ch.Div. 1985) (involved first amendment rights and right to picket).

6. *Turner v. City of Lawton,* see note 5, supra; *In re McNaught,* 1 Okl.Crim. 528, 99 P. 241, 254 (1909).

even if the state constitutional provision is ·similar to the federal constitution. The United States Constitution provides a floor of constitutional rights—state constitutions provide the ceiling.[7] The minimal national standard established by the United States Supreme Court cannot be considered dispositive in determining the scope of Oklahoma's art. 1, § 2, constitutional guarantees.[8] Here, the Oklahoma Constitution provide bona fide, separate, adequate, and independent grounds upon which the jury verdict should be affirmed.[9]

### III

The cause was submitted to the jury on three separate verdicts on each of the three theories asserted. However, the parties stipulated that the parishoners could recover only the highest amount awarded for any theory. *This stipulation was included in the jury instructions.*[10] The largest amount was a verdict for publication of private facts. It is undisputed that the publication involved post-withdrawal actions by the elders. The verdict is consistent with the findings and stipulations.[11]

Whether the acts of the elders threatened the public safety, peace or order, or whether the appellee was "molested in person or property on account of her religious worship" are questions of fact for the jury. Although I would affirm the jury verdict, if the cause is to be remanded, the Oklahoma Constitution requires that both the pre-withdrawal and post-withdrawal acts of the Elders be presented to the jury.

ALMA WILSON, Justice, dissenting in part and concurring in part:
### Prefatory Statement

When the question arises whether the right of one to express or refrain from religiously motivated conduct is paramount to the right of another to express

7. See, *Stephany v. Wagner*, 835 F.2d 497, 500 (3rd Cir.1987).

8. *People, ex rel. Arcara v. Cloud Books, Inc.*, see note 5, supra.

9. *Michigan v. Long*, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214 (1983).

10. Jury instruction number 13 provides in pertinent part:
"... 1. If you find in favor of the plaintiff against one of the defendants on either two or all three of her causes of action, and fill-in an amount of actual damages and an amount of punitive damages in the blank provided for two or all three causes of action, the plaintiff will be entitled to recover from that individual defendant only the largest number you have inserted for actual damages under the two or three causes of action and the largest number you have inserted for punitive damages for the two or three causes of action. In other words, if you insert actual damages in two or three causes of action against one defendant those numbers are not cumulative and that defendant will only have to pay to the plaintiff the largest number for actual and the largest number for punitive damages. This rule applies equally to all three defendants and a judgment will thereby be rendered against one, two or all three defendants, or against none of the defendants ..."

11. The journal entry dated September 10, 1984 provides in pertinent part:

"The Court finds that the actual damages on the three (3) causes of action of Plaintiff overlap each other and that, pursuant to agreement of the parties, Plaintiff is entitled to a judgment for actual damages against each Defendant in the highest amount for actual damages on the verdict form for the Defendant, which is, on each Defendant, the sum of Two Hundred Five Thousand Dollars ($205,-000.00). The Court further finds that the punitive damages on the separate causes of action are overlapping and that, pursuant to agreement of counsel, the highest punitive damage award on each Defendant's verdict form is the amount that will be rendered as a judgment against such Defendant, and further finds that the highest such award is the same on all three (3) Defendant's verdict forms and is One Hundred Eighty-Five Thousand Dollars ($185,000.00)."
The jury verdict dated March 16, 1984 provides in pertinent part:
"... 1. [] In favor of the plaintiff, and against this defendant on her cause of action for publication of private facts, and fix recovery at $205,000 actual damages, and $185,000 punitive damages ..."
"... 2. [] In favor of the plaintiff, and against this defendant on her cause of action for intrusion upon seclusion, and fix recovery at $114,000 actual damages, and $120,000 punitive damages ..."
"... 3. [] In favor of the plaintiff and against this defendant on her cause of action for intentional infliction of emotional distress, and fix recovery at $122,000 actual damages, and $81,000 punitive damages ..."

or refrain from religiously motivated conduct, the answer is not that one right is more valued than the other, but that each person's right extends to, but cannot intrude upon, the right of the other to freely pursue any religion, or none at all. The Constitutional guarantee of individual freedom of choice in religious worship is inviolate.

## I

The First Amendment to the Constitution of the United States of America provides:

"*Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof;* or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

This provision of the Constitution creates two very different protections. The "establishment clause" guarantees the government will neither establish nor aid religion; whereas the "free exercise clause" guarantees the government will not prevent us from freely pursuing any religion we choose—or none at all. *Molko v. Holy Spirit Association for the Unification of World Christianity,* 46 Cal.3d 1092, 252 Cal.Rptr. 122, 762 P.2d 46 (1988). Thus, while the establishment clause concerns freedom from a state imposed religion, such as the colonists journeyed to America to escape, the free exercise clause concerns individual citizen's freedom of choice in worship.

In the present case, the dilemma posed involves the competing rights of two parties who are each entitled to the same First Amendment protection. On the one hand, if the state, acting through the judicial arm of government does not protect the plaintiff's First Amendment Freedom to choose not to submit to religious infringement, pursuant to the Free Exercise Clause, the court in effect has aided the establishment of the defendant church in derogation of the Establishment Clause. On the other hand, the defendant church also demands state protection of its First Amendment

right pursuant to the Free Exercise Clause. I agree that Government action burdening religious conduct is subject to a balancing test, in which the importance of the state's interest is weighed against the severity of the burden imposed on religion. *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). However, a First Amendment interest of one party cannot be judicially deemed paramount to the same First Amendment right of the other party. The state has an equally valid interest in protecting both. The preferred position given freedom of religion by the First Amendment is not limited to any particular religious group or to any particular type of religion, but *applies to all. United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944).

## II

As the Free Exercise Clause of the First Amendment applies where an individual has been deprived of the ability to freely choose whether or not he or she will submit or adhere to religious doctrinal discipline and/or commands, civil redress must be available in such instances if the constitutional guarantee is to be given meaning. I am, accordingly, of the view that the gravamen of the present case resolves upon the plaintiff's constitutional freedom to pursue any religion, which includes her freedom *not* to pursue any particular religion, as well as her constitutionally protected fundamental right to privacy.

This case does not involve doctrinal interpretation, ecclesiastical inquisition, or jurisdictional disputes concerning questions of religious belief. Although I am in full accord with the majority as to the sanctity of these precepts from judicial review, I disagree that the gravamen of this case rests upon these tenets. Therefore, the majority's detailed discussion of the character of the plaintiff's transgression is irrelevant for two reasons: First, the parties have stipulated to the plaintiff's breach of the church moral code rendering the issue moot; and Secondly, judicial treatment of the character of the transgression is tantamount to ecclesiastical inquisition, i.e., the

conduct of the plaintiff is irrelevant. What is relevant is that which forms the basis of this suit—the conduct of the defendants; whether or not such *conduct* (not belief) is actionable; and if so, the permissible damages therefor.

### III

I further dissent to that part of the majority opinion which mandates that a formal written statement of withdrawal of church membership is prerequisite to accomplish civil recognition of the full prenumbra of an individual's rights and liberties following induction into a religious organization. Rather, I concur with that portion of the trial court's instruction to the jury which states that under the law, the plaintiff had the right to terminate her membership within the church upon *communication* of that fact to an authorized representative of the church, *at any time.* The form of the communication is not limited to written or explicit resignation. A present, unequivocal and clear expression—either by oral or written word, or otherwise—that such individual rejects the doctrine and declines further intervention by the church is sufficient. The absence of a written statement of withdrawal should not necessarily bind an unwilling adherant to aggressive incursions (as opposed to passive disassociation) by third parties based upon a doctrine which he or she no longer believes in nor practices voluntarily.

The record in this respect reveals that at the time of the so called "driveway incident", the plaintiff clearly communicated to the elders that she wanted them to leave her alone; that she would not go before the congregation to publicly repent; that she asked them to leave; that they refused to leave for some time thereafter; and that they told her they would nevertheless publicize her transgression. In my opinion, by her words and conduct, the plaintiff at that time clearly and unequivocally rejected the religious doctrine sought to be imposed by the elders and declined any further religiously motivated intervention. Though I do not question the sincerity of the elders *belief* in carrying out what they obviously

perceived to be their religious mandate, their *conduct* went beyond the scope of protection contemplated by the First Amendment when it intruded upon the plaintiff's co-existing First Amendment right to religious freedom of choice.

### IV

In a nation which has as one of its cornerstones individual religious liberty—freedom to choose to practice or not to practice a religion must be given a broad sphere within which to operate, as the nature of religious belief requires spiritual rather than material or legal interpretation. Thus, religious *belief* is absolutely immune from legal scrutiny, albeit, *conduct*, however well intentioned, cannot enjoy absolute immunity where such conduct abridges and impinges the constitutional and fundamental rights of others. *Wisconsin v. Yoder, supra; Nally v. Grace Community Church of the Valley,* 157 Cal.App.3d 912, 204 Cal.Rptr. 303, 304 (1984). It is my opinion that the First Amendment guarantee that all individual citizens of the United States shall be free from interference in choosing to practice or not to practice a particular religion; the traditional interest of parents with respect to the religious upbringing of their children; and the right to privacy in personal and familial matters constitute such fundamental rights. Consequently, the state cannot through judicial action or inaction contributorily foster the "establishment" of any church organization in disregard of a citizen's inviolate freedom of choice in these matters.

### V

Neither may the state, through judicial action or inaction, disregard the rights of the members of a church organization. In this respect, I am of the opinion that the trial court's submission of the issue of punitive damages to the jury was in error. From my reading of the trial transcript, I find no evidence upon which to base a punitive damage award, therefore, the trial court should have directed a verdict for the defendant church on this issue under this evidence. In First Amendment religious

freedom cases punitive damages may not be imposed upon defendants unless evidence of actual or implied malice is tendered to support the claim. Malice may not be presumed because to do so would emasculate the rule in First Amendment cases that any redress, if permitted, must be the least burdensome possible. *Wisconsin v. Yoder, supra.* The standard by which this mens rea element must be measured is whether the conduct of the defendant exceeded the scope of the doctrinal tenets of the church.

## VI

Finally, I must state that although I agree that this case must be remanded, and partially concur in the the statements of law therein, I dissent to the majority's characterization of the legal issues and the law as applied to the specific facts of this case. I further must take issue with the jury verdict forms in this case. The forms give the impression of a multiple choice questionnaire, which provides no clear answer. They are confusing and impermissibly inspecific, in my opinion. Upon remand, this should be corrected by the trial judge.

For the reasons stated herein, I concur in part and dissent in part to the opinion of the majority.

I have been authorized to state that DOOLIN, J., concurs in that part of opinion by ALMA WILSON, J., that is not inconsistent with the majority opinion.

HODGES, Justice, dissenting, joined by SIMMS, Justice.

I agree with the result of part III of the majority's opinion which directs the trial court to render judgment against Parishioner regarding her claims against the Elders for their pre-withdrawal acts. However, I disagree with the majority's disposition which allows upon remand the imposition of tort liability upon the Church of Christ and the Elders for their disciplinary actions that occurred after Parishioner's unilateral withdrawal of membership from the Collinsville Church of Christ by her September 25 letter. I believe the Church and the Elders were constitutionally protected under the First Amendment from civil liability to discipline Parishioner by the withdrawal of fellowship proceedings both during her church membership and after her unilateral withdrawal from the Church.

The First Amendment to the United States Constitution mandates that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." The Religion Clauses are made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (Establishment Clause); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (Free Exercise Clause).

In *Williams v. Williams,* 543 P.2d 1401, 1403 (Okla.1975), we observed:

"Freedom of religion, which is embodied in the First Amendment to the Constitution of the United States and in the due process clause of the Fourteenth Amendment, reflects the philosophy the church and state should be separate, and that both religion and government can best work to achieve their lofty aims if each is left free from the other within its representative sphere." (Citations omitted).

The courts may not intervene in purely ecclesiastical matters, including church disciplinary actions concerning the conformity of church members to the standards of morals required of them, unless such actions pose a substantial threat to public safety, peace or order. *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Paul v. Watchtower Bible and Tract Society of New York, Inc.,* 819 F.2d 875 (9th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987). Because I believe the disciplinary actions here do not constitute a sufficient threat to public peace, safety or order as to warrant civil court intervention, I respectfully dissent under the constitutional mandate of separation of church and state.

Although Parishioner does not question the Elders' right to investigate and punish members who offend Church law, she alleges the actions of the Elders concerning her private acts constitute an extreme and outrageous abuse of their position, a breach of their promise of confidentiality and a trespass on her property.

The challenged actions of the Elders include five incidents which are as follows:

## PRE–WITHDRAWAL ACTIONS

(1) "Laundromat Incident": In the summer of either 1979 or 1980, the Elders contacted Parishioner in the public laundromat with her children and advised her to go to the church with them for an urgent meeting concerning the rumor regarding her affair with Mr. S. She left her children at the laundromat and accompanied the Elders to the church. The Elders told her not to see Mr. S. After the meeting they drove her back to the laundromat.

In my opinion the Elders' actions were consistent with their religious duty to approach members in their capacity as pastors, overseers and bishops. Their conduct amounted to nothing more than a visit and discussion with Parishioner concerning her violation of the Church's moral code.

(2) "Storm Incident": In late summer of 1981, one of the Elders telephoned her and asked her to immediately come to the church building or they would come to her house. There had been a storm that day and the electricity was out at her house and the church building. She did not want to leave her children but she agreed to go to the church because she did not want the Elders to come to her house and talk in front of her children. Parishioner testified the Elders told her that whatever she said would be confidential; however this is disputed by the Elders. At the meeting she admitted she had committed fornication, told them she was going to come back to church and not see Mr. S. anymore. They told her she would have to go before the congregation and repent publicly of her sin of fornication.

Again, I think the Elders were merely following their religious procedures for discipline as Parishioner had not acknowledged the violation and repented after their first confrontation with her.

(3) "Driveway Incident": On the evening of September 16, 1981, the Elders went to Parishioner's house upon being informed by one of Parishioner's children that she was with Mr. S. When Parishioner, three of her children and Mr. S. arrived at her house the Elders approached the car in the driveway. Parishioner told her children to go inside; however, one of the children stayed on the front porch approximately fifty feet from the car. The Elders wanted her to meet with them at the church building. Parishioner told the Elders she would not meet with them and asked them to leave. They proceeded to tell her if she did not repent and make a public acknowledgement of her sin of fornication, they would withdraw fellowship from her.

Once again, the Elders were only following Church disciplinary procedures.

## POST–WITHDRAWAL ACTIONS

(4) On October 4, 1981, a letter was read before the congregation finding her to be in violation of certain scriptures relating to fornication, disobedience to the Elders and nonattendance at Church. The Elders encouraged the congregation to continue to pray in her behalf and to contact her for the purpose of encouragement and exhortation. This action is consistent with church doctrine of which she was previously informed by the Elders' September 21, 1981 letter to her.

The reading of the letter occurred at a Sunday worship service where members were present. The members were informed of her specific violation because the practice of withdrawal of fellowship requires cooperation from the entire membership. Also, such procedure operates as a deterrent of other members.

(5) On October 7, 1981, a letter detailing church action taken against Parishioner

on October 4 was sent to four nearby Church of Christ congregations.

This action was consistent with church doctrine which she had been informed. Because the Church believes members of all churches which practice the precepts of the New Testament of the Bible constitute the universal Church, their disciplinary procedures include notification of nearby churches of Parishioner's withdrawal of fellowship. This serves the purpose of purification of the Church and to prevent the sin from spreading.

In *Paul, supra,* in a factual situation very similar to the present case, the Ninth Circuit stated:

"Intangible or emotional harms cannot ordinarily serve as a basis for maintaining a tort cause of action against a church for its practices—or against its members. ... Offense to someone's sensibilities resulting from religious conduct is simply not actionable in tort. See *Cantwell,* 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213]; cf. *Cohen v. California,* 403 U.S. 15 [91 S.Ct. 1780, 29 L.Ed.2d 284] (1971). Without society's tolerance of offenses to sensibility, the protection of religious differences mandated by the first amendment would be meaningless." *Id.* at 883.

There, a member of the Jehovah's Witness Church withdrew from the Church by letter to the congregation after being advised that she could be disfellowshipped from the Church if she challenged the Elders' decision to disfellowship her parents. Subsequent to her withdrawal of membership, the Governing Body of Jehovah's Witnesses issued a new interpretation of the rules governing disassociated persons, abolishing the distinction between disassociated and disfellowshipped persons. Disassociated persons were to be treated as disfellowshipped persons, subject to the practice of shunning which is a form of ostracism similar to the Church of Christ's practice of withdrawal of fellowship. After being shunned by her former friends and coreligionists, the former member brought suit for defamation, invasion of privacy, fraud and outrageous conduct.

The Ninth Circuit held that because the practice of shunning is a part of the faith of the Jehovah's Witnesses, the Church is entitled to the free exercise of its religious beliefs under the Washington and United States Constitutions. It reasoned that to impose tort liability for shunning on the Church or its members "would in the long run have the same effect as prohibiting the practice and would compel the Church to abandon part of its religious teachings. ... The Church and its members would risk substantial damages every time a former Church member was shunned. In sum, a state tort law prohibition against shunning would directly restrict the free exercise of the Jehovah's Witnesses' religious faith." *Id.* at 881. The court affirmed the grant of summary judgment in favor of the defendants finding the Church and its members have a constitutionally protected privilege to engage in the practice of shunning.

Furthermore, in my view, the courts have no power to review the disciplinary actions of the Elders of the Collinsville Church of Christ both before as well as after Parishioner's withdrawal of membership. In *Paul, supra,* the Ninth Circuit rejected any distinction between present members and former members stating:

"Courts generally do not scrutinize closely the relationship among members (or former members) of a church. Churches are afforded great latitude when they impose discipline on members or former members. We agree with Justice Jackson's view that '[r]eligious activities which concern only members of the faith are and ought to be free—as nearly absolutely free as anything can be.' *Prince v. Massachusetts,* 321 U.S. 158, 177 [64 S.Ct. 438, 445, 88 L.Ed. 645] (1944) (concurring)." *Id.* at 883.

Parishioner had the religious freedom to join or not to join the Church of Christ, but, when she voluntarily joined, she became subject to all of its rules and laws, surrendered her religious liberty to that extent and should not now be entitled to relief from such discipline under its rules al-

though her religious convictions may have changed.

Church membership is one of contract and when a person joins a church he/she covenants expressly or impliedly that in consideration of the benefits of the relationship he/she will submit to its control and be governed by its laws, usages and custom. *Watson*, 80 U.S. at 729. The Church of Christ's right to discipline Parishioner springs directly from the contract of membership. The terms of a contract of membership are contained in the customs and usages which have evolved from any written laws. The Church of Christ views the Bible as its only source of doctrine and has no written rules or bylaws. It is undisputed the Church of Christ practices the Biblically based disciplinary procedures which include the practice of withdrawal of fellowship. This Court's review of the Church's doctrine of lifetime membership and moral discipline is precisely the kind of action the Constitution forbids.

Parishioner does not assert the Elders deviated from the Church's rules and regulations for discipline. Rather, she contends that because she was not instructed when she joined the Church that it considers its members as lifetime members and thus has no doctrinal provision for withdrawal of membership, she did not submit to this doctrinal belief. Even assuming this to be true, actual knowledge of this specific doctrine of the Church is of no consequence, however, because she impliedly consented to all of the Church's laws and customs upon becoming a member. Also, Parishioner testified she had observed previous withdrawal of fellowship proceedings.

Discipline is a necessary incident to a contract establishing church membership. " 'The church as an organized body of members must have laws and ordinances for the regulation of its existence, and for the preservation of its doctrine and discipline, and also to maintain the purity of its membership. Without such laws and ordinances it would be impossible to maintain discipline and church establishment.' " C. Zollmann, *American Church Law* § 329 (1933) (quoting *Satterlee v. United States*,

20 App.D.C. 393, 407 (1902)). Consistent with these principles is the uncontested, twofold purpose of the Church of Christ's disciplinary practice of withdrawal of fellowship: (1) to cause a disobedient member to miss the fellowship and to desire to repent, and (2) to purify the church and to prevent the sin from spreading, thus, operating as a deterrent to other members from committing the same sin.

The Church's Biblically-based practice of withdrawal of membership requires cooperation by the other church members. The letter of September 21, 1981, by the Elders to Parishioner detailed the meaning of withdrawal of fellowship, as follows:

"If by the close of the worship services Sunday morning, September 27, 1981, you have not indicated a penitent heart by a public acknowledgement of your sin of fornication, a statement will be read aloud to the congregation, with an exhortation for each to make contact with you for the purpose of encouragement, that you might 'hear them' and repent. If you so choose not to heed these exhortations, by the close of the worship services Sunday morning October 4, 1981, a statement will be read by the elders, to exclude you from the fellowship of the Body of Christ, (V–17) and notify sister congregations, which means (1) Not to associate with you, 1 Cor. 5:9, (2) Not to eat a meal or open our homes to you, 1 Cor. 5:11, (3) Not to bid you 'God Speed', 2 Jn. 11, (4) To hold ourselves aloof from you, 2 Thess. 3, and (5) Have no company with you, 2 Thess. 3:6 & 14."

Whether the Church of Christ's doctrine of withdrawal of fellowship may be viewed as unwise or improvident from an individual preference, is no concern of the courts. Our personal beliefs are not the constitutional standard; but rather, separation of church and state. Furthermore, the courts may not delve into whether the discipline imposed by the Elders was arbitrary or contrary to the Church's own doctrine, laws and procedures. *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); *Presbyterian Church v. Mary Elizabeth Blue*

*Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); *Oklahoma Dist. Court v. New Hope Assembly of God Ch.,* 548 P.2d 1029 (Okla.1976).

The First Amendment guarantees the freedom to worship as one chooses. The State may not thrust any sect on any person or coerce anyone to attend church. *Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952). A person may change his/her religious beliefs; and a person may join and leave a church for any reason. *Order of St. Benedict of New Jersey v. Steinhauser,* 234 U.S. 640, 34 S.Ct. 932, 58 L.Ed. 1512 (1914). Parishioner may disassociate herself from the Church whenever she chooses as she has in fact done. Likewise, the Elders of the Church may after her withdrawal continue to believe that she is a member for life and invoke their disciplinary actions against her in conformity with their tenets and doctrines. The State cannot meddle in religious beliefs for religious convictions and questions of faith and discipline are fully protected under the First Amendment, except where they involve a substantial threat to public safety, peace or order. In my opinion there is, in this case, no substantial threat to public safety, peace or order. Consequently, both Parishioner and the Elders are free to believe as they so desire, as the State shall not prefer one belief over another.

*Watson v. Jones,* 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1872), is the first case which addressed the principles limiting the role of civil courts in the resolution of religious controversies that incidentally affect civil rights. The Court in *Watson* cogently observed that it is inconsistent with the American concept of the relationship between church and state to permit civil courts to determine ecclesiastical questions. The United States Supreme Court has quoted extensively from this opinion in cases decided since *Watson. E.g., Serbian Orthodox Diocese v. Milivojevich, supra; Presbyterian Church v. Hull Church, supra.* In language which has recently been described as having "a clear constitutional ring," *Presbyterian Church v. Hull Church, supra,* the *Watson* Court stated:

"In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

"Nor do we see that justice would be likely to be promoted by submitting those decisions to review in the ordinary judicial tribunals. Each of these large and influential bodies (to mention no others, let reference be had to the Protestant Episcopal, the Methodist Episcopal, and the Presbyterian churches) has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of

the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so." *Id.* 80 U.S. at 728–29.

In sum, upon joining the Church of Christ, Parishioner expressly and impliedly consented to the Church's doctrine and was subject to its disciplinary procedures. The actions of the Elders taken against her were consistent with Church rules and laws both prior to and after her attempted unilateral withdrawal of membership. In my view, her withdrawal has no effect on the Elders' actions. The disciplinary proceedings against Parishioner had already begun before her withdrawal, and the Elders' post-withdrawal actions were merely a continuation of the initial proceedings against her.

I therefore would hold the Elders of the Church of Christ are free to discipline Parishioner as a Church member (and former member) under the protection of the First Amendment without State interference and Parishioner may not escape such discipline by unilaterally withdrawing her membership. I would find the trial court had no power of review over the disciplinary proceedings against Parishioner, a matter which is at the core of ecclesiastical concern, under the constitutional mandate of separation of church and state. Accordingly, I would reverse the judgment of the trial court.